### WATSON *et al. v.* WATSON *et al.*

(Division A. Jan. 11, 1937. Suggestion of Error Overruled, Feb. 22, 1937.)

[171 So. 701. No. 32494.]

**M. M. Satterfield,** of Port Gibson, and **Alexander & Satterfield,** of Jackson, for appellants.

**J. T. Drake**, of Port Gibson, for appellants.

**Anderson & Weil,** of Port Gibson, for appellees.

772

Argued orally by **J. C. Satterfield** and **J. T. Drake**, for appellant, and by **Karl Weil** and **R. B. Anderson**, for appellee.

**Smith, C. J.**, delivered the opinion of the court.

On November 6, 1934, Paul Watson died intestate leaving no children or grandchildren surviving him, and on the eighth day thereof, a petition was filed in the court below by Kattie Watson and L. S. Pearson, alleging that Kattie was the widow of Paul Watson, and praying that Pearson be appointed as administrator of his estate, Pearson was so appointed, qualified and proceeded with the administration of the estate.

In April, 1935, Henry Watson and several others filed a petition alleging that Kattie was not the widow of Watson; that although a marriage ceremony had been performed between them, she did not become his wife

for the reason that she then had a living husband from whom she was not divorced; that petitioners are Watson's next of kin, and praying that petitioners be decreed to be the true and only heirs of Paul Watson, and that Kattie be directed to return any portion of the estate that had been delivered to her by the administrator, and that the administrator "be required to distribute the entire estate, less the costs of administration" and any debts due by Watson, "to your petitioners."

There was some further pleading which resulted in an issue being presented as to the validity, vel non, of Kattie's marriage to Paul Watson, and the court below held this marriage to be valid and decreed accordingly. Kattie died after the decree was rendered, but her administrator has been made a party hereto.

The undisputed facts are that prior to 1894, Kattie was legally married to Tom Smith in Warren county, Miss., and lived with him near Bovina in that county until some time in 1894 when Smith was convicted of the commission of some crime and sentenced to serve three years in the penitentiary therefor. Thereafter, Kattie married Paul Watson in Claiborne county, Miss., and lived with him as his wife up to the time of his death in 1934.

Smith is alive, appeared in person at the trial, and the evidence discloses that no decree of divorce has been rendered dissolving this marriage with Kattie. This being true, the marriage between Kattie and Paul Watson is void unless, as her counsel say, it is valid under section 1537, Code of 1930, which provides that, "Any person who shall remain beyond the sea, or absent himself from this state, or conceal himself in this state, for seven years successively, without being heard of, shall be presumed to be dead in any case where his death shall come in question, unless proof be made that he was alive within that time; but any property or estate recovered in any such case shall be restored to the person evicted

or deprived thereof, if, in a susbequent action, it shall be proved that the person so presumed to be dead is living.'' This necessitates a further statement of the evidence.

After Smith was sent to the penitentiary, Kattie continued to live in Warren county wherein she and Smith lived, until some time in 1896, when she there married Jeff Shepherd and continued to live with him, most of the time in Warren county, until some time in 1923 when she obtained a divorce from him, and thereafter married Paul Watson with whom she lived in Claiborne county until the date of his death in 1934.

When Smith's penitentiary sentence expired, according to the evidence for the appellants, he returned to Bovina, remained there a short time, met Kattie, and learned that she was married to Shepherd. This is disputed by the evidence for the appellees. After Smith left the penitentiary, he lived for a short time in Warren county, not at Bovina, but what distance therefrom does not appear, from which he moved to Washington county, living there openly for about six years, then moved to Coahoma county where he remained for several years. Thereafter he lived openly in Issaquena and Bolivar counties, and finally moved to Tallahatchie county, where he now lives openly and has for a number of years. About ten months after leaving the penitentiary, Smith married again, and was twice married again thereafter.

Smith was reared at or near Bovina in Warren county, and after his removal therefrom kept in touch and corresponded with near relatives living either there or elsewhere in Warren county. He did not, at any time after leaving the penitentiary, communicate with Kattie unless he did so at Bovina shortly thereafter, as he and other witnesses say that he did, but there is evidence to the contrary.

Between twenty and thirty years before the trial,

which took place in May, 1935, there was a rumor around Bovina that Smith was dead. About twenty-four or twenty-five years prior to the trial, a brother of Smith told a brother of Kattie that Smith was dead, which information Kattie's brother communicated to her. It does not appear that Kattie, at any time, inquired of Smith's relatives, or of any one else, as to whether Smith was living, and if so, where he was, until after this controversy arose. She then communicated with Smith.

Smith having remained continuously in this state after his penitentiary sentence expired, the presumption of his death created by the statute does not arise, unless he concealed ''himself within this State for seven years successively without being heard of.'' Neither of these facts here exists. He lived openly at his several places of residence, and kept in touch with and visited near relatives who lived in the county in which he resided when he was sentenced to the penitentiary, inquiry of whom would have disclosed that he was alive. 1 Jones on Evidence (2 Ed.), secs. 287, 288; 17 C. J. 1170-1172; 8 R. C. L. 709. Cf. Manley v. Pattison, 73 Miss. 417, 19 So. 236, 55 Am. St. Rep. 543.

Moreover, the presumption of death created by the express terms of the statute ends when it is made to appear that the person whose death is in question is, in fact, alive. This court has so held in cases involving the validity of a second marriage by one spouse contracted during the absence of the other, among which are Spears v. Burton, 31 Miss. 547; Gibson v. State, 38 Miss. 313; Alabama & V. R. Co. v. Beardsley, 79 Miss. 417, 30 So. 660, 89 Am. St. Rep. 660. See, also, 38 C. J. 1296, and Jones op. cit. sec. 290.

But counsel for appellees says that Kattie married Watson in good faith believing, because of a rumor, and of a report to her that a near relative of Smith had said, that Smith was dead, and that this court has held that a second marriage contracted under such circumstances

is valid, citing in support thereof Essick v. Essick, 175 Miss. 412, 167 So. 420; Ladner v. Pigford, 138 Miss. 461, 103 So. 218, 221, and Harper v. Fears, 168 Miss. 505, 151 So. 745, 747, 93 A. L. R. 341. Counsel for appellees seems to say that these cases are in conflict with the statute, and former decisions of this court, but it is not necessary for us to here determine that question. Kattie's good faith in marrying Watson is challenged by the appellants, who point out that she married Shepherd before she was informed that Smith was dead, and, before marrying Watson, she could have easily ascertained that Smith was alive by inquiry of his relatives. It will not be necessary for us to respond to this contention, consequently it will be left out of view.

In the Essick case the person whose death was in question was not shown to be alive; the facts creating the presumption of death were proven, and the court held that the court below was warranted in not believing the testimony offered to show that he had been seen alive within the statutory period. The case, therefore, is of no value here.

In the case of Ladner v. Pigford, all the facts necessary to create the presumption of the death of the husband existed at the time of the wife's second marriage. The evidence failed to disclose that Ladner and his wife had not been divorced, and because of that, the court said that the second marriage of Ladner's wife to another must be presumed to be valid. The court, however, then proceeded to say that, "It has appeared from the announcement of our court that, after the statutory period, by present statute seven years, an absence from the state without being heard from by parties who would likely hear from the person if living, the other party became capacitated to contract a marriage, and, where the marriage was contracted, relying upon the statutory presumption of death, it would seem logically to follow that subsequent developments would not destroy the

marriage so contracted, the party having the right to act upon the presumption under the statute and to re-marry without a divorce; that when such right was exercised it would have the legal effect of dissolving the former marriage; and that the subsequent development that the person was actually alive would not have the effect of destroying the marriage so entered into nor to render the issue of such marriage illegitimate. It would be an anomalous situation which would capacitate a party to contract a marriage under such circumstances that would destroy such a contract entered into in good faith in the honest belief that the party was dead. It is difficult to see how a marriage can be valid and children legitimate if, after the marriage, nothing is heard from the party, and be illegitimate if, after the marriage so contracted in good faith on the belief that the person was dead, it should develop that he was not in fact dead.''

This holding, if such it was intended to be, is said to be in conflict with former decisions of this court, but aside from that, and expressing no opinion thereon, it will be observed that the court there predicated its announcement on the fact of absence from the state, without being heard of by the parties who would be likely to hear from the person if living. The case at bar does not come within the rule there announced. After the return of that case to the court below, it was again tried and the second marriage of the wife was held valid, and this decree was affirmed by this court in Pigford v. Ladner, 147 Miss. 822, 112 So. 785, on the ground that the evidence did not disclose that a divorce had not been granted prior to the second marriage. Nothing was said therein relative to any presumption of Ladner's death.

In the case of Harper v. Fears, a wife, who had contracted a second marriage, still claimed to be the wife, or rather the widow, of her former husband. In the case at bar, the wife of the former husband is claiming to

be the widow of one with whom she intermarried while her former husband was living. In that case, the court held that the second marriage must be held to be valid for two reasons: (1) That the evidence did not disclose that the first marriage had not been dissolved by a decree of divorce; and (2) that the evidence disclosed that the wife contracted a second marriage on the faith of the presumption of death created by the statute. The opinion of the court also declares that it again predicated its announcement on the fact of the "absent party not being heard from during that time," the statutory period. That case, therefore, is not authority here; as Smith's whereabouts were always known to those likely to be cognizant thereof.

Reversed and remanded.